# No. 22-4221

# United States Court of Appeals for the Fourth Circuit

––––––––––

**UNITED STATES OF AMERICA,**
*Appellee,*

***v.***

**JONG WHAN KIM,**
*Appellant.*

––––––––––

*On Appeal from the United States District Court
for the Eastern District of North Carolina*

## RESPONSE BRIEF OF THE UNITED STATES

MICHAEL F. EASLEY, JR.
*United States Attorney*

BY:   DAVID A. BRAGDON
KRISTINE L. FRITZ
*Assistant United States Attorneys*

150 Fayetteville Street, Suite 2100
Raleigh, North Carolina 27601
Telephone: (919) 856-4530

*Attorneys for Appellee*

# TABLE OF CONTENTS

Table of Authorities ................................................................. iii

Statement of Jurisdiction ........................................................ 1

Statement of Issues................................................................. 2

Statement of Facts ................................................................. 3

Summary of Argument........................................................... 16

Argument ............................................................................. 17

**I.     The district court did not plainly err in advising Defendant of the scienter requirement for his § 841 oxycodone distribution convictions.**

    A.     Standard of Review................................................... 17

    B.     Discussion of Issue. ................................................. 17

        1.     The district court did not err in advising Defendant of the scienter requirement for his offense. ........................................................ 18

        2.     Defendant has not shown a reasonable probability that he would have pleaded not guilty absent any error. .............................................. 22

            a. Defendant pleaded guilty to an Indictment that correctly alleged mens rea................................. 23

            b. The evidence of Defendant's intent was overwhelming........................................................... 24

**II.    The district court provided Defendant an opportunity to allocute.**

    A.     Standard of Review................................................... 26

    B.     Discussion of Issue. ................................................. 26

Conclusion ...................................................................................... 28

Certificate of Compliance

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Blackledge v. Allison*,
    431 U.S. 63 (1977) ................................................................. 20

*Bradshaw v. Stumpf*,
    545 U.S. 175 (2005) ............................................................19, 21

*Gonzales v. Oregon*,
    546 U.S. 243 (2006) ............................................................24–25

*Greer v. United States*,
    141 S. Ct. 2090 (2021) ............................................................ 17

*Ocasio v. United States*,
    578 U.S. 282 (2016) ................................................................ 23

*Ruan v. United States*,
    142 S. Ct. 2370 (2022) ................................................. 18, 20, 22

*United States v. Cole*,
    27 F.3d 996 (4th Cir. 1994) ..................................................... 26

*United States v. DeFusco*,
    949 F.2d 114 (4th Cir. 1991) ...............................................19, 21

*United States v. Dominguez Benitez*,
    542 U.S. 74 (2004) ................................................................. 22

*United States v. Engle*,
    676 F.3d 405 (4th Cir. 2012) ...............................................26, 27

*United States v. Lemaster*,
    403 F.3d 216 (4th Cir. 2005) ................................................... 20

*United States v. Wilson*,
    81 F.3d 1300 (4th Cir. 1996) ...............................................19, 21

## Statutes

18 U.S.C. § 3231 ................................................................. 1

18 U.S.C. § 3742(a) ............................................................ 1

21 U.S.C. § 841 ........................................................... 3, 17–18

21 U.S.C. § 846 ................................................................. 3

28 U.S.C. § 1291 ............................................................... 1

## Rules

Fed. R. Crim. P. 11 ....................................................... 18–21

Fed. R. Crim. P. 32(i)(4)(A) ............................................ 26

Fed. R. Crim. P. 32(i)(4)(A)(ii) ....................................... 26

Fed. R. Crim. P. 52(b) ...................................................... 17

## <u>STATEMENT OF JURISDICTION</u>

Defendant Jong Whan Kim appeals from a judgment of conviction following a guilty plea. Jurisdiction to the district court was established by 18 U.S.C. § 3231.

Jurisdiction to this Court is provided by 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). The judgment was entered on April 7, 2022, and Defendant filed a timely notice of appeal on April 8, 2022. J.A. 156.

## STATEMENT OF ISSUES

1.      Did the district court plainly err in advising Defendant of the mens rea requirement for his oxycodone-distribution counts where the Indictment properly alleged mens rea, and the district court ensured that Defendant had read the Indictment and discussed it with his attorney? If the court erred, did the error prejudice Defendant where he pleaded guilty to the same mens rea element as part of his conspiracy plea and the evidence of his intent was overwhelming?

2.      Did the district court plainly err in providing Defendant an opportunity to allocute where it invited him to speak on his behalf, and he did so?

## STATEMENT OF FACTS

### Procedural History

Defendant and Tammy Thompson were indicted in a 34-count Second Superseding Indictment.[1] J.A. 39–44. Defendant was charged with conspiracy to distribute oxycodone, hydrocodone, and methadone, in violation of 21 U.S.C. § 846 (Count 1); 22 counts of unlawful dispensation and distribution of oxycodone, in violation of 21 U.S.C. § 841 (Counts 2 through Count 23); unlawful distribution of hydrocodone, in violation of 21 U.S.C. § 841(a)(1) (Count 24); two counts of unlawful dispensation and distribution of methadone, in violation of 21 U.S.C. § 841(a)(1) (Counts 25 and 26); distribution of marijuana, in violation of 21 U.S.C. § 841(a)(1) (Count 32); and unlawful dispensation and distribution of hydrocodone and marijuana, in violation of 21 U.S.C. § 841(a)(1) (Count 34). J.A. 39–44.

Defendant pleaded guilty by written plea agreement to the conspiracy charge (Count 1) and seven drug-trafficking offenses (Counts 4, 8, 11, 14, 20, 21, 32). J.A. 39–40; J.A. 193. The district court sentenced Defendant to 78 months' imprisonment on Counts 1, 4, 8, 11, 14, 20, and 21; and 60 months on Count 32, all to be served concurrently. J.A. 133.

For Counts 4, 8, 11, 14, 20, and 21, the Indictment specifically alleged that Defendant prescribed oxycodone while "acting and intending to act outside the

---

[1]   For simplicity, the Second Superseding Indictment will be referred to as the Indictment.

usual course of professional practice and not for a legitimate medical purpose."[2] J.A. 40.

## Offense Conduct

Defendant earned his Doctorate in Medicine from the University of Wisconsin in Madison, Wisconsin in 1995. J.A. 176, ¶ 40. He was a physician at Clearfield Hospital until 2002. J.A. 176, ¶ 45. He then was employed as a doctor at Bladen County Hospital in Elizabethtown, North Carolina, from 2002 to 2017. J.A. 168, ¶ 8; J.A. 176, ¶ 40. In December 2016, the hospital counseled Defendant about his practices for prescribing controlled substances and documenting the need for those prescriptions. J.A. 126; J.A. 168, ¶ 8. Defendant's treatment notes failed to justify the prescriptions he issued. J.A. 126–127; J.A. 168, ¶ 8. In March 2017, rather than complying with the hospital's counseling, Defendant resigned. J.A. 126; J.A. 168, ¶ 8. One of his former patients was seen by a different doctor, who said she had never seen someone taking so much methadone. J.A. 171, ¶ 17. Later, when that patient began seeing Defendant again, Defendant prescribed him methadone for $150. J.A. 172, ¶ 17. Four days later, the patient overdosed and was administered Narcan. J.A. 172, ¶ 17.

Defendant continued to see patients and issue prescriptions from his home. J.A. 168, ¶ 8; J.A. 170, ¶ 12. Around June 2017, Defendant began dating Tammy Thompson, and she helped him with his medical practice. J.A. 173,

---

[2]  Defendant does not dispute that he received adequate notice of the elements of Counts 1 and 32. Brief at 30.

¶ 21. In September 2017, Defendant formed Dr. Kim's Adult Clinic (DKAC) in Tabor City, North Carolina. J.A. 168, ¶ 8.

DKAC had almost no medical equipment. J.A. 81; J.A. 100; J.A. 170–171, ¶ 11. He only used a scale, blood pressure cuffs, and a stethoscope during appointments. J.A. 81; J.A. 170, ¶ 11. His receptionist took patients' blood pressure, vital signs, heart rate, and blood sugar levels. J.A. 172, ¶ 19. She had no medical training. J.A. 172, ¶ 19. DKAC screened new patients for drugs, but it did not accurately record the results. J.A. 80; J.A. 170, ¶ 11. Defendant issued prescriptions regardless of the drug-test results. J.A. 80; J.A. 170, ¶ 11. One patient died of an overdose two days after seeing Defendant. J.A. 171, ¶ 16.

One DKAC employee assisted Thompson with a urine screen, during which Thompson told her it did not matter in which files she placed the urine screens, so long as they were in the files. J.A. 171, ¶ 15. Another employee said that Thompson and Thompson's daughter allowed an individual to bring groups to see Defendant, who issued them prescriptions for no medical purpose. J.A. 171, ¶ 16. The same employee said that although many patients failed drug tests, it was rare for them to be discharged. J.A. 171, ¶ 16.

Defendant saw 35 to 40 patients per day. J.A. 172, ¶ 19. They frequently smelled of marijuana. J.A. 172, ¶ 19. Defendant's office was often crowded with people, some waiting in the parking lot and others waiting late into the evening. J.A. 80; J.A. 99; J.A. 100; J.A. 170, ¶ 11. Several patients brought other people with them to appointments and were seen more quickly. J.A. 172, ¶ 19. Thompson often took groups of people back to see Defendant without an appointment.

J.A. 81; J.A. 170, ¶ 11. Thompson and another employee allowed patients they knew to be seen by Defendant first. J.A. 171, ¶ 19.

Every patient paid in cash, usually $200, regardless of whether they had insurance. J.A. 81; J.A. 100; J.A. 171, ¶ 16. Some patients exchanged construction services for prescriptions. J.A. 170, ¶ 11. DKAC paid its employees in cash every Friday. J.A. 171, ¶¶ 15–16; J.A. 173 ¶ 21.

DKAC was next to Tabor City Elementary School. J.A. 76; J.A. 171, ¶ 13. Due to DKAC's customers outside the clinic, the school had to lock down several times and frequently cancel recess. J.A. 80; J.A. 128; J.A. 171, ¶ 13. School officials asked DKAC to erect a privacy fence, which DKAC did. J.A. 171, ¶ 13. One time, Thompson told the school's principal that if they had any friends or teachers who needed prescriptions, they should let Thompson know. J.A. 171, ¶ 13.

In 2018, the Columbus County Sheriff's Office had a confidential informant pose as a patient and buy prescriptions from Defendant and Thompson 12 times. *See* J.A. 96–99; J.A. 168–170. The CI first visited DKAC on January 30, 2018. J.A. 97; J.A. 168. He waited approximately an hour, had his basic information and blood pressure taken, and paid $200 cash. J.A. 96; J.A. 168. Once in the observation room with Defendant, the CI's medical and prescription history were pulled, and he performed an initial drug screen. J.A. 96–97. This was the only appointment at which the CI performed a drug screen. J.A. 97. At the conclusion of the visit, Defendant issued the CI a prescription for 180 tablets of

methadone and a separate prescription for Gabapentin (not a controlled substance). J.A. 97; J.A. 168.

Each time the CI visited DKAC, he paid $200, had little or no medical examination, and left with prescriptions. J.A. 97–98, *see* J.A. 168–170. Several times, the CI purchased marijuana from Thompson at either DKAC or at Defendant's Stake Road residence. J.A. 97; J.A. 168–170. On April 25, 2018, while the CI was in the DKAC examination room with Defendant, Thompson brought in a bag of marijuana, which the CI bought in front of Defendant. J.A. 97–98; J.A. 169. During this same visit, Thompson told the CI that Defendant would trade work for prescriptions. J.A. 98; J.A. 169.

On May 23, 2018, the CI arrived at DKAC and was given marijuana by Thompson before entering the office. J.A. 98. Once in the examination room, the CI requested that Defendant issue him stronger medication. J.A. 98; J.A. 169. Defendant did not evaluate the CI but issued him a prescription for sixty 30 mg Oxycodone tablets and one hundred 15 mg Oxycodone tablets. J.A. 98; J.A. 169. At the conclusion of this visit, the CI handed the money for the marijuana to Defendant, who put it in his pocket. J.A. 98; J.A. 169.

On June 27, 2018, the CI visited DKAC for the last time. J.A. 98; J.A. 169. At this appointment, the CI requested that Defendant issue him a higher dose of medication so that he could sell more pills on the street. J.A. 98; J.A. 169. The CI and Defendant also discussed which pharmacy the CI should use so that the prescription would not be recorded. J.A. 98. The CI requested that Defendant issue the CI's father—who had never been observed by Defendant—

a prescription. J.A. 98; J.A. 169. At the conclusion of the visit, Defendant issued prescriptions in both the CI's and the CI's father's name. J.A. 99; J.A. 169. The CI paid Defendant $200 for his prescription and an additional $300 for the prescription issued in his father's name. J.A. 99; J.A. 169.

On June 28, 2018, the CI conducted a final controlled purchase from Defendant and Thompson at their Stake Road residence. J.A. 99. The CI and Defendant discussed the CI loaning Defendant money for a home, and Defendant told the CI that he could pay the loan interest by writing the CI prescriptions. J.A. 99; J.A. 170, ¶ 9. While at the residence, the CI exchanged $700 for 81 hydrocodone pills and a quantity of marijuana. J.A. 99.

On June 29, 2018, search warrants were executed at DKAC and Defendant's Stake Road residence. J.A. 170, ¶ 10. Defendant and Thompson each had hundreds of dollars in cash, including money from the last controlled purchase. J.A. 170, ¶ 10. During the search of DKAC, officers also found $1,600 in cash stored in two money boxes. J.A. 170, ¶ 10. At the Stake Road residence, officers discovered pills and marijuana. J.A. 170, ¶ 10. Defendant was arrested that same day. J.A. 80; J.A. 99; J.A. 165.

Lawrence Greenblatt of Duke University School of Medicine examined Defendant's medical practice at the government's request. J.A. 172, ¶ 20. Dr. Greenblatt concluded that Defendant proscribed opioids in all patient encounters reviewed, and that the basic medical-care standards were almost never met. J.A. 172, ¶ 20. The records showed abundant misuse and diversion among Defendant's patients, but Defendant did not alter his prescribing practices in any

way. J.A. 172, ¶ 20. Defendant did not obtain adequate information from pa-

tients and did not perform or document meaningful medical examinations. J.A.

172, ¶ 20. Defendant's office was not equipped to even allow a meaningful med-

ical examination. J.A. 172, ¶ 20. There was no evidence that Defendant referred

patients to other physicians or medical professionals or even reviewed outside

medical records. J.A. 172, ¶ 20. Dr. Greenblatt concluded that Defendant was

exchanging prescriptions for money while creating a sham medical record and

operating an office that did not provide safe, adequate medical care J.A. 172, ¶

20. Defendant also prescribed large quantities of opioids to himself, his wife, his

brother, and his employees, all without a legitimate medical purpose. J.A. 172,

¶ 20.

## Rule 11 Hearing

### First Change-of-Plea Hearing

On November 30, 2021, the district court held a change-of-plea hearing.

J.A. 58. Defendant's counsel said that Defendant was prepared to plead guilty

to one conspiracy charge (Count 1), six counts of prescribing oxycodone outside

the usual course of professional practice (Counts 4, 8, 11, 14, 20, 21), one count

of prescribing hydrocodone and marijuana outside the usual course of profes-

sional practice (Count 34), and one count of aiding and abetting distribution of

a quantity of marijuana (Count 32). J.A. 39–40; J.A. 43–44; J.A. 62–63.

Initially, Defendant told the court, "[L]ately[,] I'm having a little bit of

hearing difficulty" and that he wore a hearing aid. J.A. 59–60. However,

Defendant represented that he had heard and understood the court's statements and declined the court's offer to use an assisted listening device. J.A. 59–60. Following a brief miscommunication about whether Defendant had been able to communicate with his counsel, Defendant acknowledged that he understood and had been able to communicate with his attorney. *See* J.A. 60. The court confirmed that Defendant had read the indictment and discussed it with his attorney:

> THE COURT: And I understand you're proposing to plead guilty to Counts One, Four, Eight, Eleven, Fourteen, Twenty, Twenty-One, Thirty-Two, and Thirty-Four. Would you like the government to read the Second Superseding Indictment to you to make sure you understand what you're charged with?
>
> THE DEFENDANT: No, Your Honor. My counsel has explained to me those things.
>
> THE COURT: And you've read the Second Superseding Indictment, haven't you?
>
> THE DEFENDANT: Yes, Your Honor.

J.A. 62.

After the court identified the charges, Defendant said, "I understand the charges and I am prepared to plead guilty." J.A. 63–67. It then asked Defendant how he pleaded to Counts 1, 4, 8, 11, 14, 20, 21, 32, and 34. J.A. 67–68. Defendant said guilty. J.A. 68. The government advised Defendant of the penalties he was facing. J.A. 68–69. Defendant again said that he pleaded guilty to the charges contained in the plea agreement, had read the plea agreement, and that

10

he consulted with his attorney before signing the plea agreement. J.A. 71. The

court then advised Defendant on the elements of each offense. J.A. 72–75. For

Count 4, the first oxycodone distribution count, the court said:

> [T]he government must bear the burden of showing be-
> yond a reasonable doubt that you prescribed, dispensed,
> or distributed oxycodone; you acted knowingly, inten-
> tionally; and you did that outside the usual course of pro-
> fessional practice and other than for a legitimate medical
> purpose.

J.A. 73. It similarly instructed Defendant on the other oxycodone distribution

counts. *See* J.A. 73–75.

   The government then presented the factual basis for the plea. J.A. 76–84.

The court then asked Defendant if he committed the crimes alleged in Counts 1,

4, 8, 11, 14, 20, 21, 32, and 34. J.A. 85–86. Defendant answered:

> Your Honor, nothing I was doing willfully. I'm not guilty
> of any of this, Your Honor. I was just advised by my
> counsel that this is the only way I can alleviate – mitigate
> my sentence.

J.A. 86. Defense counsel requested a brief recess, which the court granted. J.A.

86. Upon his return, defense counsel acknowledged that he was not in a position

that day to enter a guilty plea and requested a continuance. J.A. 87. The court

set aside the plea agreement and issued a continuance. J.A. 90.

## Second Change-of-Plea Hearing

   Defendant and government counsel negotiated a revised plea agreement

to the same counts except Count 34. J.A. 193. The district court held another

change of plea hearing. J.A. 93–94. The court said it viewed the hearing as a continuation of the first change-of-plea hearing and asked whether Defendant would like the information pertaining to Defendant's rights, penalties, or the indictment to be repeated. J.A. 95. Defendant declined and agreed that the earlier information was incorporated by reference. J.A. 95. The government again provided a factual basis for the plea. J.A. 96–101. Defendant acknowledged that he was guilty. J.A. 104. Subsequently, the court found that Defendant's plea was knowing and voluntary and accepted the plea agreement. J.A. 104.

## Presentence Investigation Report

The United States Probation Office prepared a presentence investigation report (PSR). J.A. 166–182.

The PSR conservatively held Defendant accountable for 907 grams of marijuana, 16.2 grams of Oxycodone, 1.34 grams of Hydrocodone, 3 grams of Methadone, and 270 dosage units of Alprazolam, a Schedule IV controlled substance, which has a converted drug weight of 119.94 kilograms. J.A. 173, ¶ 22. Defendant's total offense level of 28 and criminal history category of I produced a guidelines range of 78 to 97 months. J.A. 179, ¶ 62.

## Sentencing Hearing

Defendant's sentencing began with the court asking Defendant if he had an opportunity to review the PSR and consult with his attorney, which Defendant acknowledged that he did. J.A. 117. The court then stated:

I'm familiar with your background and history. I've read the presentence report.

I've considered the defendant's sentencing memorandum.

I'm aware that 48 years ago approximately you entered the United States of America; at about the time you were 27 years old. And frankly, you have enjoyed a very prosperous life in this country, at times making over $300,000 a year.

But obviously, as presented, there were concerns about your methodology of dispensing drugs at the hospital that you were working for, and ultimately your employment was severed.

And that is when this pill mill, so destructive to the local community and so pervasive that it attracts people from other states to you to obtain illegally drugs, that's when that all starts up.

And it's near a school that has to change its method of operation from time to time because of what's going on at your place.

And this is very destructive behavior for which you stand today to be sentenced. This is killing people. This is destroying families. This is wrecking communities.

And sadly, you're not the first doctor that I will sentence for this, and I'm sure you won't be the last. And that's a very sad comment because you understand medicine; you know what this does to people's physiology; you know what this does to mental processes. And yet you used your licensing privileges to accomplish the crimes.

J.A. 117–118.

At the outset of his argument for a downward variance, defense counsel noted, "When Mr. Dysart and I got involved and got the discovery, we realized this case should not be for trial; that the government's evidence was, in fact, overwhelming." J.A. 120. In addition, defense counsel noted that after explaining the evidence and the law to Defendant and his family, "[Defendant] and his daughter and his son pretty quickly acknowledged that he, in fact, was guilty." J.A. 120–121. According to defense counsel, one difficulty preceding the plea agreement was a unique "cultural sort of issue" surrounding Defendant's sense of deep shame for dishonoring his family. J.A. 121. Defense counsel explained that while it was difficult for Defendant to overcome the deep sense of shame, he ultimately pled guilty after conversations with his family. J.A. 121. In his argument, defense counsel noted that Defendant was 75-years old, that his high blood pressure and diabetes put Defendant at risk, and that he has significant family support. J.A. 121. Ultimately, defense counsel argued that a below-guidelines sentence of one year and one day, supervised release, and a significant fine was an appropriate sentence. J.A. 123.

The court opined that this was a "crime of greed" and mentioned that Defendant had been counseled by the Bladen County hospital for his prescription practices prior to his resignation. J.A. 123. The court noted that Defendant's reluctance to honor the hospital's concern surrounding his prescribing practices "seems to run counter to what you say about his strong morality," that Defendant "wanted to enjoy the continued income stream," and that "there are so many other things he could have done when he got fired or terminated other than start

14

his own pill mill." J.A. 123–124. Defense counsel replied that he "[didn't] have explicit answers" to the court's concerns but felt that Defendant's relationship with Thompson was at least "part of how we find ourselves here." J.A. 124.

After the government presented its argument for a within-guidelines sentence, the court asked, "Is there anything you would like to say, Dr. Kim? Defendant apologized and asked for leniency:

> Your Honor, I'm sorry for making mistakes. And I made a poor judgment of associating with some unscrupulous people, and I was foolish and naive. And I committed this unprofessional conduct. But I had no – I didn't mean to hurt anyone, and I didn't mean to break any laws. I just sorry for all this evolved. And I just ask for your leniency on my sentencing.

J.A. 132. After reiterating its opinion that this was a crime of greed, the court noted that "this is conduct that persisted after its wrongfulness was brought to your attention. So your statement today that you didn't mean to break the law really falls flat." J.A. 132–133. The court imposed a low-end guidelines' sentence of 78 months' imprisonment and 3 years' supervised release. J.A. 133.

# SUMMARY OF ARGUMENT

1.     The district court did not plainly err in advising Defendant of the mens-rea requirement for his oxycodone distribution counts. The Indictment specifically charged the intent Defendant claims was lacking from his plea colloquy. J.A. 40. And Defendant admitted reading the Indictment and discussing it with his attorneys. At his plea hearing, the district court told Defendant that the government must prove he "acted knowingly [and] intentionally." J.A. 73. The district court also made it clear that this mens rea requirement applied to operating outside the usual scope of professional practice.

Defendant also cannot show that any error violated his substantial rights. *Ruan*'s change to the mens rea requirement did not change the mens rea required for a conspiracy count. And Defendant admitted the same mens rea he now denies when he pleaded guilty to conspiracy. In addition, the evidence of his intent was overwhelming.

2.     Defendant claims that the district court's opening comments providing an overview of the case and its initial thoughts deprived him of a meaningful opportunity to allocute. Brief at 40–43. But there is no rule that allocution occur at any particular time. Nor is the district court forbidden from telling parties its initial thoughts on a case before hearing from them. A sentencing court must personally address the defendant and allow him to speak or present any information to mitigate the sentence. Here, the court did precisely that. It gave Defendant a clear opportunity to allocute, and he took it. J.A. 132

16

## ARGUMENT

**I.   The district court did not plainly err in advising Defendant of the scienter requirement for his § 841 oxycodone distribution convictions.**

### A.   Standard of Review.

Because Defendant did not object below, plain-error review applies. *See* Brief at 25; Fed. R. Crim. P. 52(b); *Greer v. United States*, 141 S. Ct. 2090, 2096–97 (2021). Under plain error review, Defendant must show: (1) error; (2) that was plain; (3) that affected his substantial rights (prejudice); and (4) that "had a serious effect on the fairness, integrity, or public reputation of judicial proceedings." *Id.* (citation and internal quotations omitted).

### B.   Discussion of Issue.

Defendant argues he "was deprived of adequate notice" that the government must prove he knew or intended to act outside the scope of legitimate medical practice. Brief at 30. But the Second Superseding Indictment did provide this notice, specifically alleging that Defendant "intend[ed] to act outside the usual course of professional practice and not for a legitimate medical purpose." J.A. 40. Similarly, the court told Defendant at his plea hearing that the government must prove he "acted knowingly [and] intentionally." J.A. 73. The court did not plainly err in advising Defendant of the mens rea requirement.

And Defendant cannot show prejudice. He does not dispute that in his plea to Count 1, he admitted that he "formed an agreement" to prescribe controlled substances "outside the usual course of professional practice, and not for a legitimate medical purpose." J.A. 197–198. Conspiracy law has always

17

required this specific intent that now also applies to distribution offenses. Because Defendant admitted he possessed this intent during his conspiracy, he was not prejudiced even if he was not advised that he must also have this intent for the oxycodone distribution offenses. He cannot show that a new mens rea requirement for the distribution offenses would have stopped him from pleading guilty when he admitted the mens rea requirement was met in pleading guilty to conspiracy. In addition, the evidence strongly supports Defendant's intent to operate outside the scope of usual medical practice.

### 1.    The district court did not err in advising Defendant of the scienter requirement for his offense.

Defendant claims the district court did not adequately advise him of the scienter element of his oxycodone offenses. Brief at 26–31. We agree that under *Ruan*, the government must prove that defendant knew or intended to prescribe outside the usual course of professional practice and not for a legitimate medical purpose. Brief at 26–27 (citing *Ruan v. United States*, 142 S. Ct. 2370, 2376–77 (2022)). We also agree that "*Ruan* presents a change in law with respect to the *mens rea* required under section 841(a)(1). Brief at 28. But the Second Superseding Indictment anticipated this change in law and correctly charged mens rea. J.A. 40. And the district court did not err—certainly not plainly—in ensuring that Defendant understood the nature of his charges. *See* Fed. R. Crim. P. 11(b)(1)(G).

Rule 11 requires that before accepting a guilty plea, the district court must personally address the defendant and "inform the defendant of, and determine

that the defendant understands," "the nature of each charge to which the defendant is pleading." *Id.* The court does not have to do an "across-the-board recitation of the essential elements of the charged offense at a Rule 11 hearing." *United States v. Wilson*, 81 F.3d 1300, 1308 (4th Cir. 1996). "[D]istrict courts are wholly capable of guaranteeing that guilty pleas are knowing and voluntary without flyspecking on the appellate level." *Id.*

A defendant needs to "receive notice of the true nature of the charge," but that can be based on information received before the hearing. *United States v. DeFusco*, 949 F.2d 114, 117 (4th Cir. 1991) (internal quotations and citation marks omitted); *Bradshaw v. Stumpf*, 545 U.S. 175, 183 (2005) (holding that a judge does not have to "explain the elements of each charge" where they "were explained to the defendant by his own, competent counsel"). In deciding how to advise the defendant of the nature of the charges, the court may take into account Defendant's "age, education, and intelligence." *DeFusco*, 949 F.2d at 117. District courts do not need "to recite the elements of the offense in every circumstance." *Wilson*, 81 F.3d at 1307. "In many cases, such a procedure would be a formality and a needless repetition of the indictment, which often tracks the essential elements of the offense." *Id.*

Here, Defendant's Indictment clearly charged the mens rea that Defendant now claims he never received notice of. It alleged that Defendant prescribed oxycodone "intending to act outside the usual course of professional practice and not for a legitimate medical purpose." J.A. 40. This language meets the

19

mens rea requirement of *Ruan*. 142 S. Ct. at 2376–77. Defendant does not discuss this language in his brief. Brief at 1–43.

Before accepting Defendant's guilty plea, the court ensured that he read and understood the Indictment. At his initial plea hearing, the court told Defendant it wanted "to make sure you understand what you're charged with." J.A. 62. Defendant said, "My counsel has explained to me those things."[3] J.A. 62. The court then asked if he had "read the Second Superseding Indictment." J.A. 62. He answered, "Yes, your Honor." Before accepting the plea, Defendant agreed that the court did not need to read the Second Superseding indictment and could incorporate it by reference. J.A. 95. The court then asked, "Are you, in fact, guilty of Counts 1, 4, 8, 11, 14, 20, 21 and 32 of the second superseding indictment?" J.A. 104. "Yes, your Honor."

Defendant claims that the district court did not adequately describe the elements at the plea hearings. Brief at 30–31. At Defendant's first plea hearing, the court said, "the government must bear the burden of showing beyond a reasonable doubt that you prescribed, dispensed, or distributed oxycodone; you acted knowingly, intentionally; and you did ***that*** outside the usual course of professional practice and other than for a legitimate medical purpose." J.A. 73

---

[3]   Defendant must be held to his sworn admissions. *E.g., Blackledge v. Allison*, 431 U.S. 63, 74 (1977) (explaining that a defendant's "[s]olemn declarations in open court [at a Rule 11 hearing] carry a strong presumption of verity"); *United States v. Lemaster*, 403 F.3d 216, 221 (4th Cir. 2005) ("[C]ourts must be able to rely on the defendant's statements made under oath during a properly conducted Rule 11 plea colloquy.").

(emphasis added). Defendant claims that the court erred because it "did not inform Mr. Kim that 'knowingly or intentionally' applied to both the act of writing prescriptions and to whether he wrote the prescriptions in the usual course of his professional practice or for a legitimate medical purpose." Brief at 31. But the court did make this clear. By saying "you did *that* outside the usual course of professional practice," the court incorporated the mens rea requirement that it had just read. J.A. 73 (emphasis added). The court meant, "you [knowingly and intentionally prescribed oxycodone] outside the usual course of professional and other than for a legitimate medical purpose." J.A. 73.

Even if the court's language did not clearly incorporate the mens rea requirement, this was unnecessary because the Indictment did so. *See Wilson*, 81 F.3d at 1308; *DeFusco*, 949 F.2d at 117; *Stumpf*, 545 U.S. at 183. Defendant was 74 years old and had both a college degree and a medical degree. J.A. 166; J.A. 176, ¶ 40. He did not have any mental or emotional conditions or substance abuse issues. J.A. 175–176, ¶¶ 38–39. He managed his finances well, having a total net worth of $442,642. J.A. 177, ¶ 47. The court may properly take Defendant's age and education into account when determining that when he said he read the Indictment completely and discussed it with his attorney, he did. J.A. 62; *see DeFusco*, 949 F.2d at 117. Because the Indictment provided Defendant clear notice of the mens rea requirement, and the court ensured he read it, the court met its obligation under Rule 11.

Defendant claims that he was pleading guilty under an "entirely objective standard" that only allowed acquittal "if he 'reasonably believed' that his

21

prescription was within the usual course of professional practice." Brief at 28. But the district court never told Defendant that the standard was objective or that he could be convicted if he unintentionally acted outside the scope of usual professional practice. J.A. 58–108. The indictment specifically required subjective intent. J.A. 40. And both the plea agreement and Rule 11 colloquy told Defendant that the government must prove he acted "knowingly and intentionally." J.A. 73–75; J.A. 203. Defendant understood this requirement. J.A. 86. At his first hearing, he refused to plead guilty because "nothing I was doing willfully." J.A. 86. He later changed his mind, but this statement shows that he understood the mens rea requirement.

The district court did not err in instructing Defendant on the elements, particularly where the Indictment provided a clear and accurate statement of the mens rea requirement. And Defendant certainly cannot show plain error. He cannot show that he did not understand the mens rea requirement or that the court's colloquy was plainly erroneous.

### 2.    Defendant has not shown a reasonable probability that he would have pleaded not guilty absent any error.

For the substantial rights prong of the plain-error analysis, Defendant must show "a reasonable probability that, but for the error, he would not have entered the plea." *United States v. Dominguez Benitez*, 542 U.S. 74, 83 (2004). Defendant cannot do so. The Indictment correctly stated the elements. Defendant admitted guilt to the conspiracy count, which then required the same mens rea that *Ruan* later applied to distribution accounts. And the evidence that

Defendant intentionally acted outside the scope of usual professional practice was overwhelming.

> a.   Defendant pleaded guilty to an Indictment that correctly alleged mens rea.

As discussed above, the Indictment correctly alleged the mens rea element. J.A. 40. Defendant told the court that he read the indictment and discussed it with his attorney. J.A. 62. He initially refused to plead guilty because he did not think his conduct was willful. J.A. 86. In doing so, Defendant understood the mens rea requirement for his crimes, correctly charged in the indictment.

Furthermore, Defendant pleaded guilty to the conspiracy count. He does not deny that he knew the elements of conspiracy required the same level of mens rea that *Ruan* now requires for distribution. Brief at 23, 30, 34; *Ocasio v. United States*, 578 U.S. 282, 288 (2016). A conspiracy involves "an agreement with the 'specific intent that the underlying crime be committed' by some member of the conspiracy." *Id.* For a jury to determine that a defendant joined a conspiracy knowing its unlawful object (distributing a controlled substance not for a legitimate medical purpose in the usual course of professional practice) and specifically intended to help accomplish that goal, the jury will have necessarily concluded that the defendant had the requisite knowledge contemplated in *Ruan*. *Cf. id.* While *Ruan* changed the mens rea required for distribution, it did not change what was already required for conspiracy.

Here, Defendant admitted to mens rea as part of his conspiracy plea: "The defendant formed an agreement to . . . prescribe . . . a quantity of oxycodone . . . outside the usual course of professional practice, and not for a legitimate medical purpose." J.A. 197–198; *see also* J.A. 103 (plea hearing transcript where Defendant tells the court he has read the plea agreement, understands it, and has signed it). Defendant now claims he would not have pleaded guilty if required to admit that he intentionally operated outside the usual course of professional practice, but in his plea agreement to conspiracy, he did just that. J.A. 197–198.

Defendant's hesitance to plead guilty was based on a cultural sense of shame that his conviction would bring to his family. J.A. 121. "[Defendant] and his daughter and his son pretty quickly acknowledged that he, in fact, was guilty." J.A. 120–121. But Defendant did not want to dishonor his family. J.A. 121. He overcame this shame and pleaded guilty. J.A. 121. Here, where Defendant both was informed of the mens rea requirement and overcame a strong cultural shame to plead guilty, there is no reasonable probability that a clearer explanation of the elements would have changed his mind.

> b.  The evidence of Defendant's intent was overwhelming.

At sentencing, Defendant acknowledged that "the government's evidence was, in fact, overwhelming." J.A. 120. Defendant is a licensed doctor, educated in the United States, and the medical profession has well-accepted standards that govern prescriptions of controlled substances. *See Gonzales v. Oregon*, 546 U.S.

243, 270 (2006). In addition, Defendant knew his past practices violated medical standards because his previous employer informed him that he was counseled by his previous employer, a hospital, for his prescribing practices. J.A. 126–127, 168 ¶ 8. Rather than alter his prescription practices, Defendant chose to resign. J.A. 126–127; J.A. 168, ¶ 8. He then continued to prescribe pills from his house. J.A. 168, ¶ 8.

During the June 27, 2018, controlled buy, Defendant issued the CI a prescription after the CI requested more pills that he could sell on the street. J.A. 98. The CI also requested that Defendant write the CI's father—who had never been observed by Defendant—a prescription. J.A. 98; J.A. 169. Defendant wrote two prescriptions, one in the CI's name and one in the CI's father's name for an additional $300. J.A. 99; J.A. 169. This behavior is not borderline medical activity. Every American—much less every doctor—knows that a doctor can't prescribe narcotics for resale on the street. Similarly, every American knows that a prescription may only be written for a patient the doctor has evaluated.

The next day, at Defendant's home, the CI exchanged $700 for 81 hydrocodone pills and a quantity of marijuana. J.A. 99; J.A. 170. During this exchange Defendant and the CI also discussed the CI loaning Defendant money with Defendant paying the interest by writing prescriptions. J.A. 99; J.A. 170. Once again, this behavior is not borderline. Marijuana is illegal in North Carolina, a doctor may not sell pills, and a doctor cannot obligate himself to prescribe drugs to pay interest on a loan.

25

Defendant barely had any medical equipment in his office. J.A. 81; J.A. 100; J.A. 170–171, ¶ 11. Any medical "tests" were done by his receptionist, and there was no indication that one-time drug tests had any role other than papering the file. J.A. 172, ¶ 19; J.A. 80; J.A. 170, ¶ 11. In short, Defendant sold scripts. His limited medical paperwork simply covered his drug-dealing activities. Defendant cannot show a reasonable probability that he would have pleaded not guilty.

## II. The district court provided Defendant an opportunity to allocute.

### A. Standard of Review.

Because Defendant did not object, this Court reviews his allocution claim for plain error. *United States v. Cole*, 27 F.3d 996, 998 (4th Cir. 1994).

### B. Discussion of Issue.

Before a district court imposes a sentence, it must "address the defendant personally in order to permit the defendant to speak or present any information to mitigate the sentence." Fed. R. Crim. P. 32(i)(4)(A)(ii). Rule 32(i)(4)(A) "does not create a right of allocution at any specific point in the sentencing proceeding," *United States v. Engle*, 676 F.3d 405, 425 (4th Cir. 2012). And if a court announces its sentence before hearing from the defendant, "it is fair to assume that such a sentence is tentative and that the judge will consider the defendant's statements before imposing a final sentence." *Engle*, 676 F.3d at 425.

In *Engle*, the district court stated its intended sentence before giving the defendant the opportunity to allocute. *Id.* Before hearing from the defendant, the district court denied the defendant's motion for a downward variance, granted

the government's motion for an upward variance, and announced that the government's requested sentence of 480 months was appropriate—no less. *Id.*

In this case, the court specifically invited Defendant to speak by name before imposing sentence. J.A. 132. Defendant did speak. J.A. 132. And his counsel never objected that he did not have sufficient opportunity to be heard. The court even asked defense counsel at the close of sentencing if there was anything else he wanted to be heard on, and he said no. J.A. 135.

Defendant claims that the court's opening statements about the seriousness of the offense deprived him of the opportunity to allocute. Brief at 40. But the district court presented background information on several subjects to help guide the arguments. J.A. 117–119. It spoke about Defendant's education, his work in this country, his sale of scripts, and the court's views on how this crime affects the community. J.A. 117–119.

Defendant cites no case for his claim that these kinds of comments are not allowed. A court's opening comments are often helpful to the parties in understanding what the court already believes and how to direct their comments. If the court makes statements—even gives a sentence—that sentence is treated as tentative. *Engle*, 676 F.3d at 425. The district court did not err, certainly not plainly.

Even if the district court erred, Defendant cannot show a violation of his substantial rights because he did allocute. J.A. 132. There is no indication that the court's comments affected the scope or nature of what he said.

27

## <u>CONCLUSION</u>

For the foregoing reasons, the United States respectfully submits that the judgment of the district court should be affirmed.[4]

Respectfully submitted, this 16th day of November, 2022.

                            MICHAEL F. EASLEY, JR.
                            *United States Attorney*


BY:  */s/ David A. Bragdon*
        DAVID A. BRAGDON
        *Assistant United States Attorney*
        150 Fayetteville Street, Suite 2100
        Raleigh, North Carolina 27601
        Telephone: 919-856-4530


KRISTINE L. FRITZ
*Assistant United States Attorney*

*Of Counsel*

---

[4]  AUSA Bragdon recognizes Jacob N. Byrd, a third-year student at Campbell University School of Law, for his contributions to the preparation of this brief.

## **CERTIFICATE OF COMPLIANCE**

1.  Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, I hereby certify that this brief meets the page or type-volume limits of Rule 32(a) because, exclusive of the portions of the document exempted by Rule 32(f), this brief contains:

    ☒     28     Pages *(may not exceed 30 pages for a principal brief or 15 pages for reply brief, pursuant to Rule 32(a)(7)(A))*; or

    ☐          Words *(may not exceed 13,000 words for a principal brief or 6,500 words for reply brief, pursuant to Rule 32(a)(7)(B))*.

2.  Further, this document complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in Microsoft Word 2016 using fourteen-point *Calisto MT*, a proportional-width typeface.

*/s/ Kristine L. Fritz*
KRISTINE L. FRITZ
*Assistant United States Attorney*